# SUPREME COURT.

ALEXANDER STEWART and ANN JANE BAILEY agt. CORNELIA
M. STEWART, HENRY HILTON and others.

*Substitution of attorney — power of court to order — when motion by plaintiff to compel attorney to substitute another in his place will be granted — Burden of proof, when attorney's authority is questioned.*

As a general rule, when the right of an attorney to use the name of a plaintiff is questioned by the *opposite party*, if the attorney be a reputable member of the bar, the court will not, unless the action be one for the recovery of land, require proof of the authority to be produced; but the right of the court to require its production in all cases is. undoubted, and it will be exercised when, in its judgment, the ends of justice demand it.

Where an attorney has instituted a suit in which the name of a party appears as one of the plaintiffs, and his right so to do is challenged by the party whose name is used, he (the attorney) must affirmatively establish such right.    The burden of proof rests upon the attorney.

Where the authority of an attorney to bring an action for the recovery of the possession of real estate adversely held is questioned by a party whose name appears as one of the plaintiffs, the attorney must produce a "written request of such plaintiff or his agent to commence such action," or a "written recognition of the authority of the attorney to commence the same."

Evidence as to the pretended authority of the attorney fully considered, and, *held,* that it did not show any authority whatever from the plaintiff, either *verbal* or *written,* to use his name; nor has the said plaintiff, in any way, since ratified such use.

The court has the power, even where there has been an original employment, upon good cause being shown, to remove an attorney from charge of the action and to substitute another in his place.

Where an attorney has willfully made a misstatement in the body of his complaint, and undertaken to deceive his opponent and the court alike upon a matter which might, for certain purposes in the administration of justice. as he supposed, be material, and permitted his client to

verify the complaint which contained the falsehood by him knowingly inserted:

*Held,* that for such an act as this it would be entirely competent for the court to remove the attorney.

Where the evidence showed that the attorneys more than doubted the justice of their cause; that the action was commenced with a falsehood willfully inserted in the first pleading; that their hope of success was in a forced settlement; that a detective in the service of their adversaries was "bought over," as they supposed, to their interests; and by his treachery, as they hoped, the fears of parties interested in upholding the will were to be so worked upon as to secure $100,000:

*Held,* that the attorney who thus seeks to carry on a litigation should be stopped by the mandate of the court.

*At Chambers, September,* 1878.

MOTION by plaintiff, Alexander Stewart, to compel Mr. S. F. Kneeland, the attorney who brings the above entitled action, to substitute Mr. Ira Shafer as attorney for the said Stewart.

*Ira Shafer,* for motion.

*Chittenden & Andrews,* opposed.

WESTBROOK, *J.* — The very voluminous papers submitted upon this motion, and continuous duties at circuit, have prevented an earlier disposition thereof. The action in which it is made was commenced in May, 1878, and professes to be one to partition the real estate of the late Alexander Turney Stewart among his heirs at law. The description of the real estate sought to be divided is very general, and the complaint, alleging that the plaintiffs and some of the defendants are the owners thereof as tenants in common, fails to state that the said Alexander Turney Stewart left a last will and testament, under which some of the defendants are claiming and holding adversely, and makes no allusion whatever to, or allegation concerning, such will, claims and holdings. The plaintiff, Alexander Stewart, now moves this court that S. F. Knee

land, Esq., the attorney who instituted the action, should be removed from acting as such in his behalf, and that Ira Shafer, Esq., should "be substituted in his place and stead as the attorney for the said Alexander Stewart."

The motion is made upon the grounds:

First. Because the said Kneeland was never employed by him as such attorney; and

Second. Because the said attorney is not using the name of the said plaintiff in good faith, but, on the contrary thereof, in connection with Mr. Clark H. Chapman, an attorney and counselor at law of the state of Vermont, is endeavoring, wrongfully and wickedly, to extort money from the defendants, Cornelia M. Stewart and Henry Hilton, by means of such action and the use of the plaintiff's name.

As a general rule, when the right of an attorney to use the name of a plaintiff is questioned by the opposite party, if the attorney be a reputable member of the bar, the court will not, unless the action be one for the recovery of land, require proof of the authority to be produced; but the right of the court to require its production in all cases is undoubted, and it will be exercised when, in its judgment, the ends of justice demand it. In this case, however, a party, who declares his name is used without authority, invokes the aid of the court. Very clearly, if he has any interest in the property which is affected by the action, he has the right to select the attorney who will enforce it; and one whom he has not so chosen has no right to jeopardize that interest, and subject the party to the costs and expenses of a failure. In such a case, the individual who claims that the use of his name is unauthorized has the right, common to all mankind, to ask the court to redress a grievance. As the attorney has instituted a suit in which the name of the moving party, Alexander Stewart, appears as one of the plaintiffs, and as his right so to do is challenged by the party whose name is used, he (the attorney) must affirmatively establish such right. In holding that the burden of proof rests upon the attorney, the ordinary rules

of logic and law are followed.  He who claims that he has authority or right, derived from another, must, when it is questioned, prove it; and whether such claimed authority or right relates to the use of another's property or name, the rule is the same.  The controversy is between men, and, though one is a layman and the other an attorney of this court, the court cannot presume, when an issue thereon is directly made, that the latter has acquired rights and powers over the property of the former, the exercise of which may subject him to great loss and injury, without affirmative proof that such rights and powers have been conferred.  The use of Alexander Stewart's name as a plaintiff in an action must, as we have already intimated, affect his property.  Mr. Kneeland claims that Mr. Stewart has authorized the act, and the authority must, therefore, be proved.

In the examination of the first point which this motion presents — the employment of Kneeland by Stewart to bring this action — before considering the great mass of affidavits and papers submitted, it will be well to discuss the question whether, conceding all that Mr. Kneeland claims to be true, he has a sufficient authority to institute and prosecute this action.  Mr. Kneeland's claim is, that he saw a letter published in the New York Herald of June 7, 1876, purporting to be from the said Alexander Stewart to judge Hilton, in which a claim of being a cousin to the dead merchant is made by the writer, whereupon, on the ninth day of the same month, he wrote to the said Stewart, at his residence in Proctorsville, Vermont, informing him that "he," Kneeland, "was engaged or retained for other heirs in prosecuting their rights to the estate, and would he," Alexander, "like to join; if he would to send him," Kneeland, "the particulars of his relation."  It is further claimed that Alexander Stewart, on the reception of this letter from Kneeland, in company with his son, Robert G. Stewart, called upon the before-mentioned Clark H. Chapman, at his office in Proctorsville, showed him the Kneeland letter and authorized Chapman to employ

Kneeland to .prosecute an action on his behalf, which facts Chapman communicated to Kneeland by letter dated July 6, 1876. A copy of the alleged letter from Kneeland to Stewart is not produced, and its reception by him the latter flatly denies; but the one claimed to have been written by Chapman to Kneeland on the 6th day of July, 1876, is exhibited and forms a part of the papers read upon this motion. A careful perusal of such letter, however, fails to disclose any direct request or authority to Kneeland to commence any proceedings whatever in behalf of Mr. Stewart. Who Stewart is, and his claim to relationship with the former New York merchant are set out, and he is called in such letter "our client," but not a word is said about any action whatever, nor is any power expressly conferred to bring one. The Revised Statutes (6th edition, vol. 3 page 573, sec. 15) provide: "Any written request of such plaintiff or his agent to commence such action, or any written recognition of such authority of the attorney to commence the same, duly proved by the affidavit of such attorney or other competent witness, shall be sufficient presumptive evidence of such authority." This provision is contained in title 1 of chapter 5 of part 3 of the Revised Statutes, which chapter is entitled, "Of Suits Relating to Real Property," and the title is entitled, "Of the Action of Ejectment." Is the section we have quoted applicable to this motion?

It has already been stated that the direct prayer for relief in the complaint in this action is to partition and divide the real estate of the late Alexander T. Stewart among the parties who are therein claimed to be his heirs at law. .Confessedly, as has also been before said, the property is all held adversely by some of the defendants who claim under an alleged will of the deceased, Mr. Stewart, and to which no allusion whatever is made in the complaint. As the plaintiffs have not alleged "that such apparent devise" under which the property is claimed and held adversely "is void," as the Revised Statutes (6th edition, vol. 3, page 60, sec. 22) expressly require,

it is very doubtful whether the action in its present form, without an amendment of the complaint, can be maintained (3 *R. S.* [*6th edition*], *page* 583, *sec.* 1; *Florence* agt. *Hopkins*, 46 *N. Y.*, 182). Assuming, however, that it can be, it is very evident that the primary relief, if it is successful, must be that the heirs at law recover the possession of the property, and that the parties holding adversely under the alleged will surrender such possession. In substance and fact, then, this action is one for the recovery of the possession of real estate adversely held, and to all intents and purposes is one identical with that which was formerly known by the name of "an action of ejectment," although the ultimate relief sought is partition among its owners, which, however, can only be accomplished after their right to its possession and enjoyment shall have been established by a trial. There is nothing, then, in the form or character of the action which prevents the full application of the statute.*

. It may be argued, however, that the section we have quoted only declares and establishes the character of the evidence to be given, when the right of an attorney to institute the suit is questioned by the defendant. It is true that previous sections (12, 13, 14) prescribe the manner in which a defendant in ejectment may compel the attorney for the plaintiff to show his authority to bring the action; but the language of the fifteenth section is general, and is declaratory of the species of evidence which shall prove the power of the attorney to bring ejectment. From the general and broad words used in the last-mentioned section the conclusion seems to follow that the authority shall be evidenced by a writing in all cases, and the previous sections were inserted to enable the defendant to avail himself of its terms. If, as between the attorney of the plaintiff and the defendant, the former must produce a "written request of such plaintiff or his agent to commence such action," or a "written recognition of the authority of the attorney to commence the same," why should less than this

* See *Stewart* agt. *Munroe, ante,* 193.

be required as between attorney and client? No reason for the distinction is perceived; and as the language of the section itself covers a case like the present, and as it is founded upon the general rule that all authority conferred over real estate shall be evidenced by a writing, it is held that Mr. Kneeland, unless this section of the statute is abrogated, must bring himself within its provisions.

That nothing short of written evidence of the power to bring the action, before the adoption of the Code, would answer, was well settled (*McDermott* agt. *Davison*, 1 *Howard's Pr. Rep.*, 194). In *Howard* agt. *Howard* (11 *Howard's Pr. Rep.*, 80) it was held: "The provisions of the Revised Statutes, in relation to the production of an authority of an attorney to commence an action of ejectment, apply to suits, under the Code, to recover land." Judge HAND, in that case, said: "The statute *requires* a written request to commence the suit, either by the plaintiff or his agent, or a written recognition of the authority of the attorney to do so (2 *R. S.*, 306)." The authority of this decision has never been questioned, and its soundness is expressly recognized in *Wait's Practice* (*vol.* 1, *pages* 564, 565), and it must now be regarded as settled law.

As this action is, in substance and fact, one for the recovery of land, and as Mr. Kneeland has no written authority to commence it, or a written recognition of his rights as an attorney, it follows that this motion must be granted upon this ground only. It is due, however, to the rights of the parties, and the magnitude of the interests involved, that the grounds more especially presented and urged upon the argument should also be examined. Had Mr. Kneeland any authority, whatever, from the plaintiff, Stewart, either verbal or written, to use his name, or has the said Stewart in any way, since ratified such use?

In the discussion and examination of this question of fact, which involves the careful reading of a mass of affidavits and papers submitted on this motion, and the very great difficulty of determining and ascertaining the truth, when evidence

Stewart agt. Stewart.

taken *ex parte* is so contradictory, the great need of so construing the statute, which specifies the evidence to be given by an attorney bringing an action of- ejectment, of his authority to use the name of a plaintiff, as has been herein attempted, has been most forcibly impressed upon my judgment. Certain, it is, that the whole spirit and reason of the section, which has been commented upon, is in harmony with the construction given to it, and if, for technical reasons, already considered, it shall be eventually held that the one given is erroneous, then the suggestion of the need of further legislation upon the subject of the evidence of the retainer of an attorney by a client, is respectfully submitted. The present motion, to any one who reads the papers used therein, is a most convincing argument of such need. But leaving this digression, the consideration of the evidence of the retainer of Mr. Kneeland by Mr. Stewart will now be undertaken.

It is not claimed by Mr. Kneeland that there was any direct employment of him by Mr. Stewart, personally; the retainer, if at all, was through Mr. Clark H. Chapman, of Proctorsville, Vermont. Mr. Kneeland's line of proof is as follows: Seeing a letter published. in the New York Herald of June 7, 1876, purporting to be from Alexander Stewart, he wrote, as he claims, June 9, 1876, to said Stewart, asking if he would permit him (Kneeland) to use his name, in company with those of other parties, to a proceeding to recover the estate. Mr. Stewart, it is said, showed this letter, his son, Robert G., being with him, to Mr. Chapman, and authorized such use of his name. It is further claimed that, upon several occasions between the year 1876 and that of 1878 (the suit not having been commenced until May 6, 1878), the said Alexander Stewart admitted to various parties the employment of both Chapman and Kneeland. It is further claimed that, July 12, 1878, Kneeland wrote to Mr. Chapman informing the, latter that suit had been brought, and afterwards, on August 10, 1878, Kneeland again wrote to Mr. Chapman, inclosing a copy of the summons and complaint. Mr. Chapman then testifies

that he read both letters, and the summons and complaint, to Mr. Stewart, who was pleased with what had been done, and ratified the same. Directed, as the line of proof is, to transactions and interviews before suit brought, and those occurring after it had been commenced, the same order will be observed in the discussion.

Did Kneeland write, on the 9th day of June, 1876, to the plaintiff, Alexander Stewart, for authority to use his name? The fact that he did so write is sought to be established by Abraham Gruber, the managing clerk of Mr. Kneeland, by Mr. Kneeland himself, by Mr. Chapman, who claims the letter was exhibited to him by Mr. Stewart and his son, Robert, by the letter of Chapman to Kneeland, of the date of July 6, 1876, in which the former says, "Mr. Alexander Stewart and his son, Robert G., have just brought me your letter of the ninth ultimo;" and by the affidavit of Mr. Henry H. Armsden, who declares a letter, purporting to be written by Kneeland to Stewart, was shown to him in August, 1876. In regard to the letter which Armsden saw, it should be observed that it is described in the affidavit as one that "purported to be in reply to one or more that had been written to said Kneeland from said Stewart, or some one that Stewart got to write for him," whilst the one, the existence of which is in dispute, was a volunteer letter from Kneeland to Stewart, suggested by the supposed publication of one from the latter to judge Hilton, which appeared in the New York Herald. On the other hand, Mr. Alexander Stewart, his wife, and the members of his family, deny the reception of any letter whatever from Kneeland. If such a letter had been sent, and received by Stewart, it is impossible to conceive that it would not have been the subject of conversation in his household; and if that letter had resulted in the formal authority to Chapman and Kneeland to commence an action in his name, then, when the letter of June 12, 1878, was sent by Kneeland to Chapman, and the extract therefrom, stating the commencement of the action, given to him (Stewart), and

Stewart agt. Stewart.

when, also, that of August 10, 1878, was received, inclosing the copy of summons and complaint, it is impossible to conceive that Mr. Stewart would be going from one man to another exhibiting the extracts from the letter, and the copy of summons and complaint, asking to have them read, and disclaiming all knowledge upon the subject. All this he undoubtedly did do, as is abundantly proved by the oaths of parties of unquestionable character. The evidence upon the point will be referred to hereafter in the discussion of the question, whether Stewart, after the action was commenced, formally assented to and adopted it? We are now dealing with the problem of an original employment in 1876; and, in solving that, it is not so important to determine whether Kneeland, on June 9, 1876, wrote to Stewart for authority to make him plaintiff in the suit to be brought as it is to ascertain whether Stewart gave the consent asked for. Granting, for the sake of argument, that Kneeland wrote the letter of June 9, 1876, and that Stewart received it, the important fact still remains to be affirmatively shown that Stewart gave to it a favorable response, one which would authorize not only an examination of his claims, but a formal power to enforce them by suit. In determining this point, we naturally turn to the letter of Chapman to Kneeland, of the date of July 6, 1876, claimed to be an answer, written at Stewart's request, to the communication of Kneeland of June 9, 1876. If Stewart intended fully to empower Kneeland to prosecute an action, would not that letter have so declared? Not a word of that kind does it contain. His relationship to the late Alexander T. Stewart is given, and he is several times styled " our client," but not a single word about the commencement of any action can be found therein. The expression " our client " could properly be used if a suit had not been determined upon, and the whole matter was under advisement. If we turn from the letter to Mr. Chapman's version of the interview, which produced it, as contained in his affidavit of September 27, 1878, the same absence of any direct author-

ity to commence a suit is conspicuous. In that affidavit, after stating the call upon him by Stewart and his son, Robert, and the exhibition of the Kneeland letter, he thus states the interview: " They both wished me to answer Kneeland's letter ; I listened to the old man's story, *and wrote it down from his lips*, in the letter to Kneeland, which is attached to his deposition herein, dated July 6, 1876, and marked exhibit E ; he then said he wanted I should help him ' get his rights, in what he called ' a large property,' and said that if I would I should be well paid ; after writing the letter, I made the following charge on my book : ' July 6, 1876, Robert G. Stewart and his father, debtor, to time and consultation and letter to Kneeland, $1.00 ;' from that time forward said Alexander has often talked with me about his claims as heir to the large estate, and was always inquiring how the matter was going on ; I did not make any further charges against him ; the next event in order was the letter of July 12, 1878." It will be remembered that the letter of July 6, 1876, is from a lawyer to a lawyer, and claimed to be written in response to one asking for power to do a specific act, and the affidavit is made by the writer of a letter who knows that the point in controversy is the direct authority to commence an action. If such authority was given it should have been given in plain words ; and if intended to be expressed by the phrase " our client," the counsel failed so to say in the letter which he wrote, though therein, as he swears, he states " the old man's story as it fell from his lips," and in the affidavit which he has made. It is possible that Mr. Chapman so construed the interview of July 6, 1876, as to confer authority to bring an action ; and he swears, in an affidavit of September 20, 1878, that he was often requested by Stewart " to direct S. F. Kneeland, an attorney of said city, to take such steps as he should see fit to procure his part of the property," but it is manifest, when we have a letter written July 6, 1876, which purports to give all that Mr. Stewart said, and a detailed ver-

sion of that interview in a subsequent affidavit that no author-
ity to commence an action was conferred. There was, if
Chapman's statement is true, a general conference upon the
matter, enough said to enable Chapman to speak of him as
" our client," but no authorization of the use of a name as
plaintiff in any suit or proceeding to be instituted. If there
was some conversation about Stewart's right to a share in the
estate of a New York merchant, held as early as the year
1876, in view of the flat denial by Stewart and all his family
of any actual authority conferred to institute a suit, and more
especially on account of the repeated declarations which he
made to many persons after the suit was commenced, and at
a date when he had not been brought in contact with judge
Hilton, or any of his friends, that he had not authorized any,
it is impossible for me to judicially hold that authority to
bring an action was given prior to the institution thereof.

The next question is, has Alexander Stewart, since the suit
was actually begun, adopted it as one authorized by him?
The answer to this also depends largely upon the evidence of
Mr. Chapman. The testimony on this point begins with a
letter from Kneeland to Chapman, dated July 12, 1878, relat-
ing in part to private business between them, but also contain-
ing this clause : " Your client, Alexander Stewart, heads the
list of plaintiffs in my partition suit against the Stewart estate.
I don't know that he can be proved an heir, but his name makes
him a convenient figure-head." Mr. Chapman says that he
copied this extract from the letter, with a few additional lines,
and that he " read this paragraph fully and clearly to him.
He was delighted that the suit was going on, and said that if I
would stick by him and get his rights I should be well paid."
Mr. Stewart says, that when the extract was given him, " I
took the writing home, and, being unable to read it, handed it
to my daughter and she read it to me, *and I was mad*," &c.
As to which is the more natural story, that he was " *delighted* "
or " *mad* " on being called " *a convenient figure-head*," does
not require much argument. Mary Stewart, the wife of Alex-

ander, and Isabella Jeffs, a daughter, both testify, that when the extract was read at home, Mr. Stewart directly and flatly repudiated the suit; ex-governor Ryland Fletcher also deposes, "that in July last he" (Stewart) "showed me a paper which purported to be an extract of a letter from S. F. Kneeland to Clark H. Chapman, and said to me at the time that he knew nothing of this, I don't know what it means, I have received this paper from Chapman." Henry A. Fletcher, a son of the governor, testifies to a similar interview by Stewart with him on the same subject. Other witnesses also testify to similar statements. Upon this testimony, it is difficult to assume that Mr. Stewart approved the act, which the letter informed him of, and we now pass to the conduct of Stewart on the reception of the copy summons and complaint which was about a month later and in August, 1878.

Mr Chapman says: "I think I gave this complaint to Alexander Stewart personally. At all events, I saw him, while it was in his hands, read portions of it to him, and explained to him that it was a complaint in an action brought by the heirs to recover their interest in the Stewart estate in New York. * * * He was very much pleased that Kneeland had commenced and was pressing the suit." The delivery of these papers to him, and their explanation by Mr. Chapman, Mr. Stewart denies, and says: "Chapman gave it to my daughter, Mrs. Jeffs, on a Saturday, and Mrs. Jeffs took it to ex-governor Ryland Fletcher, and when she came home she told me the governor could not read it, and that he desired her to tell me to bring the paper with me the next day (Sunday), when his son would read it for me. The reason he could not then read it was because of the defect of his eyes from old age." Mr. Stewart then details his visit to governor Fletcher, the next day, and his interview with both the father and son; also one with a Mrs. Thompson, and her husband, a deputy sheriff, who read the papers to him. Mrs. Stewart and her daughter, Mrs. Jeffs, again confirm Mr. Stewart. That he visited ex-governor Fletcher and son

to learn the contents of the papers is proven by both, and Mr. Samuel L. Thompson deposes to the fact that on "Sunday, August 18, 1878," Stewart called to see him and said, "Mr. Thompson, I wish you would read this; I have shown it to Isabella, and she couldn't read it at all, or make it all out." The witness then read the document, and after some conversation about the need of Stewart going to New York, Stewart further said, "I did not know anything about all this; what does it mean? I did not know anything about it, until Clark H. Chapman handed me this. I have here an extract written on a piece of paper which Chapman gave me." The witness then states the exhibition to him of the extract from the letter of July 12, 1878. Is not the weight of the evidence upon this point also against Mr. Chapman? If the summons and complaint had been fully explained, and Mr. Stewart satisfied and pleased, why did he seek information from so many and various persons; and why did he wish to employ and retain Mr. Walker as his counsel, as the latter swears he did? A party fully informed as to his rights, and satisfied with the counsel in whose hands he had reposed them, would not be seeking for information from his neighbors as to the contents of papers already explained and understood, nor be anxious to secure new legal talent at a heavy expense. Contradicted by Stewart, the wife and daughter, and by the events which there occurred, I am unprepared to hold that Mr. Stewart ratified and confirmed the suit. In reaching this conclusion all the evidence has not been adverted to. Reference has not been made to the evidence of Pryce Lewis, B. Gastin Jayne, Robert Filton, Mary Stewart, Isabella Jeffs and others stating admissions by both Kneeland and Chapman that they had not been employed, nor to that of William H. Walker, Bush, Johnson and others who testify to conversations with Stewart, in which, with more or less distinctness, he recognized an employment of Kneeland and Chapman for some purposes. It would be impossible, in an opinion which ought to be kept within rea-

sonable limits, to discuss every particle of evidence contained in papers numerous and voluminous beyond precedent.

The leading points, as they seem to me, have been commented upon, and the conclusion of my own judgment is reasonably clear that whatever Mr. Chapman may have supposed was the extent of the power conferred upon him, and whatever conversations and talks may have been held about Alexander Stewart's rights as a supposed heir of Alexander T. Stewart, deceased, a suit in his name was never authorized, nor one brought, without his knowledge, ratified and adopted.

We are now brought to the last question which this motion presents, and that is, assuming an original employment of Kneeland and Chapman, has their conduct, in the management of the interests claimed to have been committed to their charge, been such as to justify the court in permitting Mr. Kneeland, the attorney who appears therein, to further occupy that position. It needs no authority to prove that the court has the power which is invoked. Its doors are open to all suitors who seek justice by honest and honorable means; but it cannot, and will not, allow its process and powers to be invoked either for dishonorable and unjust ends, nor its machinery kept in motion by dishonorable and unjust means. If the plaintiffs in this action have claims which they deem just and honest upon the Stewart estate, they may select their own attorneys to enforce them; but such attorneys, in their presentation, must not seek to impose upon the court, nor use its powers to accomplish their purposes by wicked or corrupt practices. If they do, the court, for its own honor and dignity, will, either on its own motion or at the instance of the party who employed the attorneys, remove them from charge of the action.

In considering the conduct of Mr. Kneeland in the management of the suit which he has instituted, the fact cannot be overlooked that he has willfully made a misstatement in the body of a complaint, which he has permitted one of the plaintiffs, Ann Jane Bailey, to verify. His own affidavit

concedes that the residence of Alexander Stewart was stated as in Whitehall, in the state of New York, purposely to avoid a motion to compel security for costs. Probably the reason which induced the false statement was unsound in law, as Ann Jane Bailey, the co-plaintiff, was a resident of this state, but the false statement is very significant as to the methods which might be employed to carry the suit to a successful issue. Explain, as ingenious counsel have attempted to do, such conduct, the fact remains that an attorney of this court, charged with a most important suit, if it has any basis whatever, undertook to deceive his opponent and the court alike upon a matter which might, for certain purposes in the administration of justice, as he supposed, be material, and permitted his client to verify the complaint which contained the falsehood, by him knowingly inserted. For such an act as this, it would be entirely competent for the court to grant this motion. Though the attorney deemed his cause to be just, he had no right, by a willfully false statement of a fact in a pleading, to seek to attain any advantage whatever; and if the court should arrest his further procedure in the cause for that act alone, it would not be an unreasonable exercise of its power in behalf of its own dignity and the purity of its own officers. The act was plainly misconduct in his office as an attorney, for which Kneeland could be punished; and the adoption thereof by Mr. Chapman on its discovery, as his affidavit discloses he observed it, by not insisting upon the correction of the willful untruth, makes him a sharer in the guilt justly attached to it.

Passing, however, from the point just made, the good faith of the suit and the modes and methods relied upon for success will now be considered. In his letter to Kneeland, of July 6, 1876 (the first written, and the one claimed to be the authority for the suit), Mr. Chapman says: "I am inclined to think there may be something in it — this claim of our client to a cousinship with the dead New Yorker. *But I very much doubt if the heirs can set aside the will.* And, yet, no mor-

tal or divinity can *guess* what a N. Y. jury would do.   A
Detroit jury disagreed on the allowance of E. Ward's will
(the Michigan millionaire), *and so forced a settlement*, by
which the heirs got a slice, and it is possible the Manhat-
taners might go and do likewise."   This letter is remarkable
for its admissions.   Mr. Chapman " very much " doubted if
the will of Mr. Stewart could be broken.   He did not believe
in the justice of the suit which he claims he was authorized
to empower Kneeland to bring, yet, relying upon the igno-
rance or prejudice of a jury of " Manhattaners," he thinks a
disagreement " is *possible* " and thus a settlement may be
" *forced*."   Comment upon such confessions is useless.   No
standard of professional ethics yet established would justify
a suit with such views of its integrity and such hopes of
success.

It may be argued, however, that Mr. Kneeland entered
upon the action with no such thoughts.   Unfortunately, the
evidence is very clear that he did.   Mr. Robert Fitton, of
Cavendish, in the county of Windsor, and state of Ver-
mont, who, in April, 1878, was confided by Chapman with
the collection or renewal of a note, held against Kneeland,
testifies that he saw Kneeland in New York, and, after obtain-
ing a new note from him, was intrusted by Kneeland with
a message to Chapman.   That message, to insure accuracy in
its delivery, was written down by Fitton (its substantial accu-
racy is not denied by Kneeland), and it was in these words :
" Tell Chapman that, in a few days, I shall be ready to move
on the Stewart estate, and that there is money in it for him
and me ; that the Stewart estate did not want to be sued, and
that judge Hilton would pay well not to be molested in his
property, which he knew did not belong to him, and that every
suit or move made him blue, and that all they had to do was to
sue and see him squirm, and that he would pay well to get
rid of a suit against the estate.   He also told me to tell Mr.
Chapman, to make the suit more secure, he would swear that
Alexander Stewart's residence was in Whitehall, New York,

instead of Proctorsville, Vermont, as it would be better to
have.it appear that Mr. Stewart was a New Yorker, and that
by so doing they would not have to give security for costs."
This message was communicated to Chapman, who very pru-
dently requested Fitton to say nothing about it.

On July 12, 1878, Kneeland wrote to Chapman: "Your
client, Alexander Stewart, heads the list of plaintiffs in my
partition suit against the Stewart estate. I don't know that
he can be proved an heir, but his name makes him a conven-
ient figure-head."

From these letters and the verbal message, it is clear that
both Kneeland and Chapman had no faith in the justice of
their cause; their hopes were in the fears of their opponents,
and a possible disagreement of a jury, which would *force* a
settlement. About this there can be no mistake, as the evi-
dence is furnished by themselves. Now, what next was done?
Mr. Bryce Lewis, a New York detective, after considerable
search, found Stewart and brought him to New-York. This
occurred early in September. Kneeland having learned from
Chapman that Stewart was in care of Lewis, under the name
of Brown, sought an interview, and succeeded. The result of
this and subsequent interviews was a *bona fide* agreement, as
Kneeland supposed, between Lewis and himself, by which the
former agreed to aid in procuring a settlement of the suit for
the sum of $100,000, for which service, by writing, dated
September 5, 1878, Mr. Kneeland pledged his " sacred honor
as a gentleman," and his "hopes for eternity," that, to use his
exact language, " I will pay Bryce Lewis one-tenth of all the
moneys I shall make out of it, as soon as the same is received
by me." In a letter to Chapman, dated September 6, 1878,
and purporting to be "written in haste," Mr. Kneeland
informs him of this transaction thus : " Lewis is a detective,
*and I have bought him over*. He will go back with Stewart,
probably on Monday night. * * * I have made arrange-
ments with Lewis to give him a certain per cent on all I make
under any settlement perfected within three months; and I

have got him to be a detective on me, as well as Stewart, eking out the things I want to have the other side know." A step had now been taken to consummate the original plan, which was to force a compromise. The employe of Hilton had been "bought * * * over," and he was to pretend to be a detective on Kneeland, and his business was to aid Kneeland in the compromise by, among other ways, "eking out the things" that Kneeland wanted "to have the other side know." To characterize this by no unnecessarily harsh epithets, it will be sufficient to say, of this method of prosecuting a lawsuit, that it was more novel and unprofessional than ingenious. It disarmed Mr. Chapman of all suspicions; and when Messrs. Bryce Lewis and B. Gastin Jayne visited Mr. Chapman, at Proctorsville, for the object, at first professed to Chapman, of devising the machinery to force the settlement, he freely confessed his disbelief in the justice of the suit, the want of authority to commence it, and, thereupon, being confronted with the evidence of his confessed guilt of an attempt wrongfully to extort money, and being requested to choose between the position of "defendant or witness," chose the latter, and, on the demand of Jayne and Lewis, surrendered the Kneeland letters. Having given up the letters of Kneeland to parties employed as detectives, of which he had full knowledge, the letter of Chapman to Kneeland, announcing the act, and justifying it on the ground that Lewis wanted them, and, to use his own language, because "you say, in yours of the sixth, I can trust him fully," is certainly a grim sarcasm. The fact has not been overlooked that Chapman undertakes to vary the events of these interviews somewhat. He does admit, however, that, in the final one, Jayne's language was threatening, and he said, among other things, "you are liable to indictment, and have got to take your position either as defendant or witness. All we want of you is to give up the letters that Kneeland has written to you in the last few weeks; Kneeland is ruined any way." A lawyer of the age of fifty-six years, who has

filled important public offices, conscious of no guilt, could not, under such language, have made any concessions. The delivery of the letters thereon stamp the story of Jayne and Lewis as true. By force of admissions made to them, as they have testified to, could the delivery of the letters only have been accomplished.

The result of this evidence, which has been briefly sketched, is clear. Both Chapman and Kneeland more than doubted the justice of their cause. The action was commenced with a falsehood willfully inserted in the first pleading; their hope of success was in a forced settlement; a detective in the service of their adversaries was "bought over," as they supposed, to their interest, and by his treachery, as they hoped, the fears of parties interested in upholding the will of the dead New York merchant were to be so worked upon as to secure $100,000. This plan was not only embodied in letters and messages, but plainly confessed to their supposed instruments; and the question now presented is, conceding a full employment by Stewart to bring the action, conceding an honest belief in counsel of its righteousness and justice, can this court — the highest in the state, of original jurisdiction — tolerate such modes and methods to success? To this there can be only one answer, and that is, that the attorney who thus seeks to carry on a litigation should be stopped by its mandate; when, however, a cause, in the justice of which counsel have no faith, is carried on by such means as have been confessedly employed in this, the answer should be, if possible, more emphatic. Mr. Kneeland's functions, as the attorney for Mr. Stewart, at least, must terminate. More than this it is unnecessary, if we had the heart to do so, to say; but to say less is forbidden by every consideration of self-respect, and a due regard for professional honor.

The order of the special term must be one granting the motion, and any further action is submitted to the general term.